UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-184-TBR


DURACORE PTY LTD.                                                      Plaintiff

v.

APPLIED CONCRETE TECHNOLOGY, INC., *et al.*                           Defendants


MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Plaintiff DuraCore Pty Ltd.'s Motion for Summary Judgment. (Docket No. 67.) Defendant David Johnson has responded, (Docket No. 70), and Plaintiff has replied, (Docket No. 71). Fully briefed, this matter is ripe for adjudication. For the reasons enumerated below, the Court will GRANT in part and DENY in part Plaintiff's Motion.


Factual Background

Plaintiff DuraCore Pty Ltd. ("DuraCore") is an Australian company that sought "to purchase a line of concrete products marketed under the name 'Protecrete'" from Applied Concrete Technology, Inc. ("ACT"). (Docket No. 67-1 at 1.) As of December 2012, the Defendant David Johnson, a resident of Kentucky, was the president and sole shareholder of ACT. (Docket Nos. 67-1 at 5; 67-2 at 17.) ACT was an Illinois Corporation that the Secretary of State of Illinois administratively dissolved in 2013 due to its failure to file an annual report with the Secretary. (Docket Nos. 64 at 4; 67-1 at 5; 67-3 at 69.) This dispute arises from a transaction between DuraCore and ACT, in which ACT was to sell Protecrete concrete products to

1

DuraCore in exchange for $107,400.00 tendered via wire transfer. (Docket Nos. 64 at 3; 67-3 at 119, 142.)

In March of 2013, DuraCore reached out to Mr. Johnson regarding its interest in purchasing concrete products from ACT. (Docket No. 67-1 at 1.) In an email from March 7, 2013, Mr. Johnson expressed his enthusiasm for the business relationship and stated that ACT "look[ed] forward to a long and prosperous future" with DuraCore. (Docket No. 67-3 at 122.) Mr. Johnson also informed Andrew McLeay, director of DuraCore, in the email that he "would want to work with [DuraCore] on a country wide basis and let [DuraCore] setup the distributors for the area." *Id.* At the conclusion of the email, Mr. Johnson represented to Mr. McLeay that it was "perfectly legal" to sell Protecrete in Australia as ACT "sold there first" and contended that he had "a mountain of proof" to support his statement. *Id.* Consequently, on March 11, 2013, Mr. Johnson sent an invoice to DuraCore for the purchase of Protecrete. (Docket Nos. 67-1 at 2; 67-3 at 144.) ACT was to make the Protecrete products available for pickup in Paducah, Kentucky. (Docket No. 67-4 at 2, 36.) On March 12, 2013, Mr. Johnson emailed Mr. McLeay and stated that he was "[l]ooking forward to [their] business relationship" and commented that it had "been a long time waiting for [DuraCore's] return to the real PROTECRETE." (Docket Nos. 67-3 at 123; 67-4 at 2 (emphasis in original).) Then, on March 13, 2013, Mr. Johnson sent an email to Mr. McLeay to answer some of Mr. McLeay's questions about the transaction and included the comment that "it might be worth [ACT's] while to get as much product as [it] can in[to] AU." (Docket Nos. 67-3 at 135; 67-4 at 2.)

The parties continued to negotiate and finalize their transaction until April 12, 2013 when Mr. McLeay wired $107,400.00 to ACT's bank account at PNC Bank. (Docket No. 67-4 at 3.) According to Mr. McLeay, he arranged for a freight company to pick up the Protecrete products

2

from the designated location in Paducah, Kentucky and deliver them to DuraCore's location in Australia, but ACT refused to deliver the goods. (Docket No. 67-4 at 3.) Mr. McLeay also contends that he made "repeated demands upon David Johnson and ACT to deliver the Protecrete products or return [the] money; however, neither has occurred to date." (Docket No. 67-4 at 3.) Mr. Johnson does not deny these events as described by DuraCore. (*See* Docket No. 70 at 1.) Instead, he emphasizes that he was involved in the transaction at issue "only in his representative capacity as president of ACT." (Docket No. 70 at 1.)

Mr. Johnson contends that ACT could not deliver the Protecrete products to DuraCore due to a pre-existing exclusive distributorship agreement with another Australian company. (Docket Nos. 67-1 at 3; 67-2 at 67-73; 67-3 at 54-68.)  On May 1, 2008, ACT and Mr. Johnson entered into an exclusive distributorship agreement with Protecrete NSW & ACT Pty Ltd. ACN also known as Protecrete International (Aust). (Docket No. 67-3 at 54.) This agreement was still in place and enforceable at the time that Mr. Johnson was negotiating with DuraCore in 2013. (Docket No. 67-2 at 72-73.) After DuraCore wired $107,400 to ACT in April of 2013, attorneys for Protecrete International sent a letter to ACT stating that if ACT proceeded with the transaction with DuraCore, it would take legal action for ACT's breach of their exclusive distributorship agreement.  (Docket No. 67-3 at 91.)

Following the parties' failed transaction, Mr. Johnson, as the sole officer and shareholder of ACT, made the decision to allow ACT to be administratively dissolved by the Secretary of State of Illinois. (Docket Nos. 67-2 at 74-77; 67-3 at 69.) However, even after ACT's dissolution, Mr. Johnson continued to take orders for Protecrete under the corporation's name from customers and to pay himself a commission for sales made using funds from the dissolved corporation's checking account. (Docket Nos. 67-2 at 83-104; 67-3 at 72-86.)

3

In addition to his continued operation of ACT after its involuntary dissolution, Mr. Johnson also used funds from ACT's checking account to pay for personal expenses as well as the legal fees associated with the creation of All Green Chemical Solutions, LLC ("All Green Chemical"). (Docket Nos. 67-2 at 140-42, 145-52, 174-76; 67-3 at 93, 100-11, 116.)

With regards to personal expenses, Mr. Johnson used ACT's funds to pay for a warehouse in which he stored his personal car collection and items from his garage. (Docket Nos. 67-2 at 146; 67-3 at 103-06.) In total, Mr. Johnson spent $10,700 of ACT's funds to pay Rasche Cycle Company to store his personal car collection and items from his garage in a warehouse. (Docket No. 67-3 at 103-11.) ACT's only property stored in the approximately 7,000 square foot warehouse was three paint sprayers. (Docket No. 67-2 at 148-49.)

In addition to the payments he made to rent the warehouse for his personal car collection and garage items, Mr. Johnson also authorized payments from ACT to his family members. Sandra Johnson, Mr. Johnson's mother, signed three checks from ACT to herself for a total amount of $6,500.00 between May 24, 2013 and June 18, 2013. (Docket Nos. 67-2 at 140-42; 67-3 at 100-03.) Sandra Johnson was still a signatory on the account despite her formal retirement from ACT. (Docket No. 67-2 at 143.) According to Mr. Johnson, Sandra Johnson received the close in time payments as compensation "[f]or past, current, and present consulting fees for bookkeeping." (Docket No. 67-2 at 144.) When asked about the fair market value for bookkeeping service, Mr. Johnson responded that he felt he owed his mother the money. (Docket No. 67-2 at 145.) Mr. Johnson also approved of checks written on behalf of ACT to his sister, Andrea Bright. (Docket Nos. 67-2 at 168; 67-3 at 98, 113.) On August 7, 2014, Andrea Bright signed a check on behalf of ACT to herself in the amount of $1,000. (Docket No. 67-3 at 113.) Mr. Johnson contends that the check from ACT to Andrea Bright was to compensate her for the

4

consulting she did on behalf of ACT. (Docket No. 67-2 at 169.) When asked about the nature of her consulting work, Mr. Johnson responded that her work was "[p]robably [for the] website." (Docket No. 67-2 at 169.)

Mr. Johnson also used ACT's funds to pay for the legal fees to form All Green Chemical, his new limited liability company. (Docket No. 67-1 at 6.) On April 7, 2014, Mr. Johnson used funds from ACT's account to pay LegalZoom.com for its assistance in forming All Green Chemical. (Docket Nos. 67-2 at 174-76; 67-3 at 116.) According to ACT's bank statement, Mr. Johnson paid LegalZoom.com $522.99 to form All Green Chemical using ACT's funds. (Docket No. 67-3 at 116.)

It was not until August 28, 2014 that Mr. Johnson opened an account at U.S. Bank for the newly formed All Green Chemical and formally discontinued his use of ACT's bank account for his personal and business transactions. (Docket No. 67-3 at 90.) When Mr. Johnson opened All Green Chemical's bank account, he made the decision to withdraw the remaining $15,440.33 from ACT's bank account, the total sum of ACT's funds, close the account, and transfer all of ACT's funds to All Green Chemical's new account. (Docket Nos. 67-2 at 118; 67-3 at 89.) Mr. Johnson's transfer of ACT's remaining funds provided All Green Chemical with "its initial capital infusion." (Docket No. 67-2 at 119.) While Mr. Johnson contends that in return for all of ACT's funds All Green Chemical assumed all of ACT's liabilities, there is no formal or even informal documentation of such an arrangement. (Docket No. 67-2 at 120-21.) Additionally, Mr. Johnson sold ACT's "intellectual property, trademarks, copyrighted literature, testing documentation, customer, vendors, suppliers, and anything else" to All Green Chemical for a mere one dollar. (Docket No. 67-3 at 112.) With regards to the trademark alone, Mr. Johnson has admitted that it has a value of greater than one dollar. (Docket No. 67-2 at 158.)

Following Mr. Johnson's aforementioned actions, ACT has no assets and has not satisfied its obligations to its many creditors.  (Docket Nos. 67-2 at 45-62; 67-3 at 89-90, 112.)

## Procedural Background

As a result of the failed transaction between the parties, DuraCore filed this action on October 18, 2013. (Docket No. 1.) Subsequently, on March 11, 2014, DuraCore received a default judgment against ACT and Mr. Johnson as a result of their failure to respond to DuraCore's Complaint. (Docket No. 11.) Then, on September 17, 2014, Mr. Johnson filed a Motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure seeking relief from this Court's entry of default judgment against him. (Docket No. 17.) The Court granted Mr. Johnson's Motion for relief on November 10, 2014. (Docket No. 22.) Importantly, the default judgment granted against ACT remains intact.

In its Second Amended Complaint, DuraCore seeks to hold Mr. Johnson liable for conversion and fraud. (Docket No. 64 at 6-7.) DuraCore also requests that this Court pierce ACT's corporate veil and hold Mr. Johnson liable for ACT's default judgment. (Docket No. 64 at 7-8.) Finally, DuraCore seeks to receive punitive damages against Mr. Johnson for his alleged actions. (Docket No. 64 at 8.)

## Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The

6

Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (first citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); then citing *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). Additionally, when evaluating whether or not summary judgment is appropriate, the Court must view all the facts and the inferences drawn from it in the light most favorable to the nonmoving party." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008)).

"To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." *Compuware Corp. v. Moody's Inv'rs Servs.*, Inc., 499 F.3d 520, 525 (6th Cir. 2007) (quoting *Prebilich–Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002)). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotation marks omitted). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

## Discussion

Before addressing DuraCore's claims for conversion and fraud as well as its requests that this Court pierce ACT's corporate veil and grant it punitive damages, this Court must consider DuraCore's argument regarding Mr. Johnson's invocation of the Fifth Amendment privilege against self-incrimination.

During his deposition on November 18, 2015, Mr. Johnson invoked his Fifth Amendment right against self-incrimination and declined to answer any questions about the transaction between ACT and DuraCore at issue in this case. (Docket No. 67-2 at 185-206.) As a result, DuraCore now argues that "because Mr. Johnson asserted his Fifth Amendment privilege and refused to respond to questions about facts raised by DuraCore, he is . . . barred from challenging those otherwise established facts as genuine issues." (Docket No. 71 at 3.) DuraCore has compiled an itemized list composed of twenty-six facts that it argues this court must consider as "without issue." (Docket No. 67-1 at 8.) In response, Mr. Johnson disagrees with DuraCore's characterization that the "foundation of a deposition question becomes established as fact if that fact is not answered on the basis of the Fifth Amendment privilege." (Docket No. 70 at 3.) Mr. Johnson argues that this Court does not have "to make the most negative possible inference on all questions to which Mr. Johnson refused to respond." (Docket No. 70 at 3.)

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has established that this protection "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). However, if one invokes his Fifth Amendment privilege and chooses not to testify, "a negative inference *can be drawn* from [his] failure to testify in civil proceedings, and . . . drawing such an inference violates neither the Fifth Amendment nor Due Process." *Hoxie v. Drug Enf't Admin.*, 419 F.3d 477, 483 (6th Cir. 2005) (emphasis added) (citing *Baxter v. Palmigiano,* 425 U.S. at 318-19).

It is within the district court's discretion whether or not to draw a negative inference. *U.S. Commodity Futures Trading Comm'n v. Complete Developments LLC*, No. 10-CV-02287, 2013 WL 1284296, at *7 (N.D. Ohio Mar. 27, 2013) (first citing *FDIC v. Fidelity & Deposit Co.*, 45 F.3d 969, 977 (5th Cir. 1995); then citing *La Salle Bank Lake View v. Seguban*, 54 F.3d 387, 389 (7th Cir. 1995); and *FTC v. Ross*, 2012 WL 4018027 (D. Md. September 11, 2012)). DuraCore has not cited a Sixth Circuit case that provides guidance as to when a district court should draw a negative inference when ruling on a Motion for Summary Judgment — a subject of dispute among other circuits.[1] *Id.* (first citing *SEC v. Smart*, 678 F.3d 850, 858 n.8 (10th Cir. 2012); then citing *Stichting Ter Berhartiging Van de Belangen v. Schreiver*, 407 F.3d 34 (2d Cir. 2005)). As our fellow Sixth Circuit district court noted in *Complete Developments*, when ruling on a party's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "all reasonable inferences must be drawn in favor of the non-moving party," which creates an inherent "tension with employing a negative inference against a non-moving party." *Id.* at *8 (citing *Scott v. Harris*, 550 U.S. 372 (2007)). In its landmark case on the issue, the Seventh Circuit determined that "a judgment imposing liability cannot be based on [one's] failure to

---

[1] DuraCore cites *Traficant v. C.I.R.*, 884 F.2d 258, 265 (6th Cir. 1989), where the Sixth Circuit held that once a litigant invoked his Fifth Amendment right against self-incrimination and declined to answer interrogatories, the lower court properly barred him from introducing other evidence on the matters to which he had already invoked the privilege. The Sixth Circuit reasoned that "such limits are properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege." *Id.* (first citing *Spevack v. Klein*, 385 U.S. 511, 515 (1967); then citing *Baxter v. Palmigiano*, 425 U.S. 308 (1976)). The court cautioned though that "when the issue is whether a court may impose broad limits on the admissibility of evidence, the cases permit only limits directly related to the scope of the asserted privilege. *Id.* (first citing *Securities and Exchange Commission v. Cymaticolor*, 106 F.R.D. 545 (S.D.N.Y. 1985); then citing *In re Anthracite Coal Antitrust Litigation*, 82 F.R.D. 364 (M.D. Pa. 1979)). This rule is not applicable here as Mr. Johnson has not sought to introduce any evidence on the matters to which he has invoked his Fifth Amendment right against self-incrimination. DuraCore's invocation of this rule would be more appropriate in a Motion in Limine prior to trial. Here, the question for the Court is whether or not to draw a negative inference from Mr. Johnson's invocation of his Fifth Amendment rights when considering DuraCore's Motion for Summary Judgment.

testify alone; adverse evidence must also be produced." *Id.* (citing *La Salle Bank*, 54 F.3d at 391). Additionally, with regards to motions for summary judgment, the Seventh Circuit proposed that negative inferences "should be limited to an admission that the facts revealed by the opposing party's evidence are true." *Id.* (citing *La Salle Bank*, 54 F.3d at 391, 391 n.7).

Here, what DuraCore proposes is that this Court draw a negative inference against Mr. Johnson with regards to each fact for which he invoked his Fifth Amendment and essentially deem those facts as established and indisputable. (Docket No. 67-1 at 7-8.) However, DuraCore's request and interpretation of the law would "allow [Mr. Johnon's] Fifth Amendment silence to be deemed [an] admission by [him] of all of [DuraCore's] arguments and interpretations [which] skates too close to causing the invocation of the constitutional right to directly and without more lead to the conclusion of liability, which is forbidden." *Complete Developments*, 2013 WL 1284296, at *9. Many of the facts that DuraCore requests that this Court draw a negative inference about relate to Mr. Johnson's subjective intentions and his knowledge at the time of the disputed transaction. (Docket No. 67-1 at 8-10.) This Court declines to draw such negative inferences from Mr. Johnson's invocation of is Fifth Amendment right against self-incrimination as this Court believes that such a heavy burden would be in direct contradiction to the requirement that it draw all reasonable inferences in favor of the non-moving party. Furthermore, Mr. Johnson's knowledge and intentions are subject to dispute and speculation even if this Court were to draw negative inferences and deem the facts revealed by DuraCore's evidence with regards to the transaction true.

I. Conversion

In its Second Amended Complaint, DuraCore brings a claim against David Johnson for Conversion. (Docket No. 64 at 6.) DuraCore argues that Mr. Johnson's alleged refusal to give DuraCore a refund constitutes conversion of its property. *Id.*

"Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014) (first citing *St. Auto. Mutual Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. App. Ct. 1990); then citing *Oliver v. J.J.B. Hilliard*, Nos. 2010–CA–001138–MR, 2010–CA–001236–MR, 2010–CA–001428–MR, 2010–CA–001479–MR, 2013 WL 762593 (Ky. Ct. App. Mar. 1, 2013)). Under Kentucky law, a claim for conversion has seven elements. *Id.* Those seven elements are as follows:

> (1) the plaintiff had legal title to the converted property;
>
> (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;
>
> (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;
>
> (4) the defendant intended to interfere with the plaintiff's possession;
>
> (5) the plaintiff made some demand for the property's return which the defendant refused;
>
> (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and
>
> (7) the plaintiff suffered damage by the loss of the property.

*Id.* (quoting *Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005)). Importantly, even if a plaintiff can satisfy all seven of the aforementioned elements, "a plaintiff cannot maintain a conversion claim in addition to a breach of contract claim unless [it] can establish the existence of an independent legal duty separate and apart from the contractual obligation." *Beacon Enter. Sols. Grp., Inc. v. MDT Labor, LLC*, No. 3:12-CV-00759-H, 2013 WL 253134, at *4 (W.D. Ky. Jan. 23, 2013) (alteration in original) (quoting *First Const., LLC v. Gravelroad Entm't., LLC*, 2008 WL 2038878, at *5 (E.D. Ky. May 12, 2008)). In other words, "a conversion claim cannot be brought where the property right alleged to have been converted arises entirely from the contractual rights." *Id.* (quoting *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005)) (internal quotation marks omitted). While "[a] conversion claim and contract claims are not always incompatible," this rule does act as an impediment to conversion claims. *See Davis*, 399 F. Supp. 2d at 801.

With regards to the liability of an agent or officer of a corporation for the tort of conversion, "[l]he law is well settled that an agent of a corporation [can be] personally liable for a tort committed by him though he was acting for the corporation." *CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 568 F. App'x 461, 467 (6th Cir. 2014) (quoting *Small v. Bailey*, 356 S.W.2d 756, 757 (Ky. 1962)). When a "defendant corporate officer actively participates in the wrongful conversion of another's property, he is personally liable for the tort . . . [even if] he was acting for the corporation and derived no personal benefit from his acts." *Koehring Co. v. Tyler*, 209 F. Supp. 750, 752 (W.D. Ky. 1962) (citations omitted).

Here, Mr. Johnson argues that DuraCore cannot hold him liable for the tort of conversion. (Docket No. 70 at 3-4.) Specifically, Mr. Johnson contends that "a claim for conversion cannot lie against [him] where the only property of [DuraCore's] over which he is alleged to have

wrongfully exercised control is the same property that is the subject of the breach of contract claim for which [DuraCore] already holds a default judgment against ACT." (Docket No. 70 at 4.) In response, DuraCore argues that because Mr. Johnson was not a party to the contract between DuraCore and ACT in his personal capacity, he is not subject to the limitation described above. (Docket No. 71 at 6.)

Though the parties have cited multiple cases, the Court finds the facts of this action most analogous to the facts in *First Const., LLC v. Gravelroad Entm't, LLC*, No. CIV. 6:07-155-DCR, 2008 WL 2038878, at *5 (E.D. Ky. May 12, 2008). In that case, the plaintiff First Construction, LLC filed an action against the defendants GravelRoad Entertainment, LLC ("GravelRoad") and three of GravelRoad's members. 2008 WL 2038878, at *1. The parties' dispute arose when the defendant GravelRoad allegedly "accepted a deposit of $208,685.00 to supply certain equipment, fixtures, and services . . . but failed to do the work." *Id.* First Construction sought to hold GravelRoad as well as all three of its members liable for the tort of conversion because according to First Construction, they "failed to use the money for the purpose intended under the . . . contract" *Id.* at *5 (internal quotation marks omitted). After considering the parties arguments, the court found that First Construction had failed to successfully bring a claim for conversion. The court explained that "[c]learly, the property right alleged to have been converted [arose] entirely from rights created under the contract," as the Plaintiff was "seeking repayment of the monies it paid to the Defendants because the Defendants allegedly breached the contract by failing to perform their obligations under the contract." *Id.* "Whether [First Construction was] entitled to the $208,685.00 and whether the Defendants failed to perform [was] governed by the terms of the parties' contract." *Id.* As such, the court determined that First Construction could not

"maintain a claim for conversion [because the] sole property right alleged to have been converted [was] the contractual right to compensation." *Id.*

In this action, the plaintiff DuraCore seeks to hold Mr. Johnson liable because he and ACT failed to use the funds from DuraCore for the purpose for which they were intended under the parties' contract. (Docket No. 71 at 6.) As in *First Construction*, "the property right alleged to have been converted arises entirely from rights created under the contract." 2008 WL 2038878, at *5. Whether DuraCore is entitled to $107,400 and whether Mr. Johnson along with ACT failed to perform is governed by the terms of the contract between DuraCore and ACT—a contract which Mr. Johnson was intimately involved in negotiating and creating as the sole officer and shareholder of ACT. DuraCore simply cannot bring a claim for conversion as a matter of law because the sole property right alleged to have been converted arises entirely from rights created by the contract at issue.

## II. Fraud

According to the Kentucky Supreme Court, a party seeking to recover for fraud in the inducement "must establish six elements by clear and convincing evidence." *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). Those six elements include the following: "a) material representation, b) which is false, c) known to be false or recklessly made, d) made with inducement to be acted upon, e) acted in reliance thereon, and f) causing injury." *Id.* (citing *Rickert*, 996 S.W.2d at 468). Additionally, "a misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." *PCR Contractors, Inc. v. Danial*, 354 S.W.3d

14

610, 613 (Ky. Ct. App. 2011) (quoting *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010)); *see Kentucky Electric Development Co.'s Receiver v. Head*, 68 S.W.2d 1, 3 (Ky. 1934) (emphasis added) ("An accepted rule is, a misrepresentation, to be actional, must concern an existing or a past fact, and not a future promise, prophecy, or opinion of a future event, *unless declarant falsely represents his opinion of a future happening*."); *see also Major v. Christian County Livestock Market,* 300 S.W.2d 246, 249 (Ky. 1957) ("One may commit 'fraud in the inducement' by making representations as to his future intentions when in fact he knew at the time the representations were made he had no intention of carrying them out.") Lastly, "[w]here the proven facts or circumstances merely show inferences, conjecture, or suspicion, or such as to leave reasonably prudent minds in doubt, it must be regarded as a failure of proof to establish fraud." *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, No. 2008-CA-002389-MR, 2010 WL 2696278, at *8 (Ky. Ct. App. July 9, 2010) (citing *Goerter v. Shapiro*, 72 S.W.2d 444 (Ky. 1934)).

In Kentucky, an agent of a corporation can be held "personally liable for a tort committed by him although he was acting for the corporation." *Smith v. Isaacs*, 777 S.W.2d 912, 914 (Ky. 1989) (quoting *Peters v. Frey*, 429 S.W.2d 847 (Ky. 1968)); *see also Hart v. Fifth Third Bank, Inc.*, No. CIV.A. 3:09CV-189-H, 2009 WL 3171950, at *2 (W.D. Ky. Sept. 28, 2009) (citing *Isaacs*, 777 S.W.2d at 914.)  The Kentucky Supreme Court has unequivocally stated that with regards to the issue of "whether [an individual's] position as an officer or shareholder in [a] corporation immunizes him from tort liability in circumstances where he would be otherwise liable if he were not a shareholder. It should be obvious that it does not." *Chas Coal, LLC v. Nat'l Coal Corp.*, No. CIV.A. 6:06-118, 2007 WL 136312, at *4 (E.D. Ky. Jan. 16, 2007) (quoting *Isaacs*, 777 S.W.2d at 914). The Kentucky Court of Appeals re-affirmed this

established principle when it stated that "[w]hile an agent or corporate officer is normally not liable for the debts or contractual obligations of the principal, an agent or corporate officer is not immune from liability for his own intentional misconduct or for negligence based upon a breach of his own duty." *Young v. Vista Homes, Inc.*, 243 S.W.3d 352, 363 (Ky. Ct. App. 2007) (first citing *Isaacs*, 777 S.W.2d at 913; then citing *Peters*, 429 S.W.2d at 849). Therefore, under Kentucky law, DuraCore can seek to hold Mr. Johnson personally liable for the tort of fraudulent inducement in connection with statements he made about the failed transaction between DuraCore and ACT.

In this action, DuraCore seeks to hold Mr. Johnson personally liable for allegedly fraudulently inducing "DuraCore to send money to ACT despite his knowledge that ACT could not sell Protecrete products to DuraCore due to an existing exclusivity agreement with another Australian distributor." (Docket No. 67-1 at 14.) In support of its position, DuraCore points to several statements made by Mr. Johnson. On March 7, 2013, Mr. Johnson sent an email to Andrew McLeay of DuraCore. In his email, he stated that he "look[ed] forward to a long and prosperous future with" DuraCore and he "would want to work with [DuraCore] on a countrywide basis and let [DuraCore] set up the distributors for the area." (Docket No. 67-3 at 122; *see also* Docket No. 67-1 at 14.) He also stated that it was "perfectly legal" for ACT to sell Protecrete in Australia as ACT "sold there first," and he claimed to have "a mountain of proof." *Id.* On March 11, 2013, Mr. Johnson sent DuraCore an invoice for the Protecrete materials that ACT was to send DuraCore. (Docket No. 67-3 at 142.) Subsequently, in an email on March 12, 2013, Mr. Johnson informed Mr. McLeay that he was "[l]ooking forward to [their] business relationship . . . in 2013." (Docket No. 67-3 at 123; *see also* 67-1 at 14-15.) In that same email, he also stated that it had "been a long time waiting for [DuraCore's] return to the real

PROTECRETE." (Docket No. 67-3 at 123 (emphasis in original); *see also* Docket No. 67-1 at 15.) In another email dated March 13, 2013, Mr. Johnson told Mr. McLeay that "it might be worth our while to get as much product as we can in AU." (Docket No. 67-3 at 135; *see also* Docket No. 67-1 at 15.) Lastly, in an email to Mr. McLeay on April 3, 2013, Mr. Johnson told him that they "need[ed] to get [the] invoice paid for so [he could] order the needed supplies and chemicals to make all of this product and get it ready for shipping." (Docket No. 67-3 at 140.)

DuraCore argues that Mr. Johnson made all of the aforementioned statements with the knowledge of their falsity as he never had any intention to fulfill any transaction with DuraCore because he had already signed an exclusive distributorship agreement with another Australian company. (Docket No. 71 at 8.) On May 1, 2008, ACT and Mr. Johnson entered into an exclusive distributorship agreement with Protecrete NSW & ACT Pty Ltd. ACN also known as Protecrete International (Aust). (Docket No. 67-3 at 54.) The agreement was still in place and enforceable at the time that Mr. Johnson was negotiating with DuraCore in 2013. (Docket No. 67-2 at 72-73.) As the distributorship agreement was still binding when ACT entered into a contract with DuraCore, attorneys for Protecrete International sent a letter to ACT on May 23, 2013 stating that if ACT proceeded with the transaction with DuraCore, it would "constitute a clear breach and repudiation of the [exclusive distributorship agreement] entitling [Protecrete International] to exercise its rights against [ACT], including for recovery of damages and without limitation, lost profits." (Docket No. 67-3 at 91.)

Ultimately, the parties disagree as to whether Mr. Johnson's material representations 1. were false when he made them and 2. whether he knew they were false or made them recklessly. (Docket Nos. 70 at 5; 71 at 6.) The Kentucky Court of Appeals has stated that "one of the more fundamental rules of fraud" is that "[f]or a representation to qualify as a fraudulent

misrepresentation, the party making the representation—at the time of making it—must know the representation is false or make it recklessly without any knowledge of its truth." *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 615 (Ky. Ct. App. 2011) (citing *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 n.16 (Ky. 2004)). Additionally, the court has declared that "[t]his rule applies equally to representations of a declarant's present intent to perform a future promise." *Id.* (citing *Bear, Inc.*, 303 S.W.3d at 143-44).

After much consideration, the Court believes that there is a material issue of fact with regards to the question of whether or not Mr. Johnson knew at the time he made the material representations at issue that "he had no intention of carrying them out." *Christian County Livestock Market*, 300 S.W.2d at 249. The simple existence of the exclusive distributorship agreement between Mr. Johnson and ACT and Protecrete International is not sufficient to prove that Mr. Johnson "falsely represent[ed] his opinion of a future happening." *Kentucky Electric Development*, 68 S.W.2d at 3. Perhaps he intended to breach his contract with Protecrete International and deliver the products to DuraCore when he made the aforementioned statements. There is just not sufficient evidence in the record for this Court to conclude that Mr. Johnson never had any intention of carrying out his promises to DuraCore when he made the statements at issue. While the weight of the evidence may favor DuraCore, nevertheless, this is a question for a jury to decide.

### III. Pierce the Corporate Veil

Before addressing the merits of DuraCore's request for this Court to pierce ACT's corporate veil, this Court must contend with the threshold question of whether it must apply Kentucky or Illinois law when making its determination of whether or not DuraCore is entitled to

summary judgment on its claim to pierce the corporate veil of ACT. A federal court acting

pursuant to its diversity jurisdiction must apply the choice of law rules of the state in which it

sits. *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013) (citing *Klaxon

Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Therefore, as this Court sits in

Kentucky, it must look to Kentucky's choice of law rules. The Kentucky Court of Appeals has

articulated a choice of law rule with regards to veil piercing. *Howell Contractors, Inc. v. Berling*,

383 S.W.3d 465, 467 (Ky. Ct. App. 2012). In establishing a choice of law rule for piercing the

corporate veil, the Kentucky Court of Appeals followed the Restatement (Second) Conflicts of

Laws § 307 (1971) which states that "[t]he local law of the state of incorporation will be applied

to determine the existence and extent of a shareholder's liability . . . to its creditors for corporate

debts."[2] *Howell Contractors, Inc. v. Berling*, 383 S.W.3d 465, 467 (Ky. Ct. App. 2012); *see also

EiA PROPERTIES, LLC v. Fenwick Equestrian, LLC*, No. 5:14-CV-328-REW, 2015 WL

5698540, at *3 (E.D. Ky. Sept. 28, 2015). Here, ACT was an Illinois corporation, and therefore,

---

[2] As a fellow district court in Kentucky has noted, applying the choice of law rule established by the Kentucky Court of Appeals in *Howell*, is in accord with the Sixth Circuit law on the subject. *EiA PROPERTIES*, 2015 WL 5698540, at *4. This Court's fellow district court explained the following:

> The Sixth Circuit has . . . given guidance on choice of law in the veil piercing context. "Under the long-standing Erie doctrine, in actions brought in federal court invoking diversity jurisdiction, a court must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal court is located." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007) (applying Ohio law) (citing *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 604 (6th Cir. 2005) (looking "to the choice of law provisions of the forum state" to determine which substantive law applies)). "When the success of a state law claim brought in federal court under diversity jurisdiction is dependent on piercing the corporate veil, this question of substantive law is governed by the law of the state in which the federal court sits." *Id.*
>
> *Corrigan's* recognition that forum law governs the substantive question of veil piercing is not inconsistent with *Howell* and indeed incorporates the forum state's choice of law rules. The Sixth Circuit's direction to "apply the same substantive law as would have been applied if the action had been brought in a [Kentucky] court" further supports this conclusion. *Corrigan*, 478 F.3d at 723; *accord Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) ("Because this is a diversity action, the law of the forum state, including the choice-of-law rules, apply.").

*Id.*

this Court must apply Illinois law to determine whether or not it should pierce ACT's corporate veil.[3] (Docket No. 67-3 at 69.)

"Under Illinois law, a corporation is presumed to be separate and distinct from its officers, shareholders, and directors, and those parties will not be held personally liable for the corporation's debts and obligations." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008) (quoting *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007)) (internal quotation marks omitted). However, equity "has created a device called 'piercing the corporate veil,' which prevents purveyors of fraud and injustice from hiding behind the corporate form of organization." *Dimmitt & Owens Fin., Inc. v. Superior Sports Products, Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002) (citing *Alpert v. Bertsch*, 601 N.E.2d 1031, 1036 (Ill. App. Ct. 1992)). According to Illinois law, a court's power to pierce the corporate veil "should be exercised reluctantly and cautiously." *Id.* (citing *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 541 (7th Cir. 1980)). Additionally, the party wishing to pierce the corporate veil "must make a substantial showing" that the corporation was in reality just "a dummy or sham" for its owners. *Buckley v. Abuzir*, 8 N.E.3d 1166, 1170 (Ill. App. Ct. 2014) (citing *In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994)).

"Piercing the corporate veil is not a cause of action but, rather, a means of imposing liability in an underlying cause of action." *Buckley v. Abuzir*, 8 N.E.3d 1166, 1169 (Ill. App. Ct. 2014) (citing *Peetoom v. Swanson*, 778 N.E.2d 291, 295 (2002)). Once a party has a judgment

---

[3] While Kentucky's choice of law rules require this Court to apply Illinois law in its determination of whether or not to pierce ATC's corporate veil, it is important to note that even if this Court were to apply Kentucky law, the result would be the same. In a relatively recent case, the Kentucky Supreme Court looked to the Seventh Circuit Court of Appeals' application of Illinois law in two separate opinions in its explanation of the equitable doctrine of piercing the corporate veil. *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 163-64 (Ky. 2012) (first citing *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008); then citing *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991)).

against a corporation, it can attempt to obtain the judgment from another corporation or individual by piercing the corporate veil. *Gajda v. Steel Sols. Firm, Inc.*, 39 N.E.3d 263, 270 (Ill. App. Ct. 2015) (citing *Buckley*, 8 N.E.3d at 1169). Here, DuraCore has obtained a default judgment against ACT, (Docket No. 11), and seeks to pierce the corporate veil and obtain the judgment against ACT from Mr. Johnson, (Docket No. 64 at 7-8).

When determining whether or not to pierce the corporate veil, Illinois courts apply a two prong test which requires "(1) a unity of interest and ownership that causes the separate personalities of the corporation and the individual to no longer exist; and (2) the presence of circumstances under which adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice or promote inequitable consequences." *Cosgrove Distributors, Inc. v. Haff*, 798 N.E.2d 139, 141 (Ill. App. Ct. 2003) (citing *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996)). The Court will analyze each of these prongs below.

### A.  Unity of Interest and Ownership

To determine whether the first prong requiring unity of interest and ownership exists, the Court must examine multiple factors, including:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005) (first citing *Jacobson*, 664 N.E.2d at 331 (1996); then citing *Estate of Wallen*, 633 N.E.2d at 1357-58). Notably, "[n]o single factor is determinative," meaning that a court is not to rest its decision on one factor alone. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012) (citing *Estate of Wallen*, 633 N.E.2d at 1357).

DuraCore requests that this Court pierce the corporate veil of ACT as it argues that Mr. Johnson created ACT as his "alter ego." (Docket No. 67-1 at 19.)  The Court need not consider all of the aforementioned factors as a majority of the factors weigh in favor of piercing ACT's veil and satisfy the first prong of the test. *Cosgrove Distributors*, 798 N.E.2d at 141 (citing *Jacobson*, 664 N.E.2d at 331).

### 1. Inadequate Capitalization

While no single factor is determinative, "[t]he capitalization of a corporation is a major factor in assessing whether a legitimate separate corporate entity existed." *Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001) (citing *McCracken v. Olson Cos.*, 500 N.E.2d 487, 492 (Ill. App. Ct. 1986)). The legal test for undercapitalization is "whether the corporation has so little money that it cannot operate its business on its own." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 612 (7th Cir. 2009) (first citing *Judson Atkinson Candies*, 529 F.3d at 379; then citing *Browning–Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999)). For a corporation to operate on its own, it must have "adequate equity (usually in addition to debt), though how *much* equity depends on the facts of the case." *Id.* Essentially, "there must be some equity" because "[s]hareholders are generally expected to invest some money  . . . if they want the benefit of limited liability." *Id.* (citing *Fontana*, 840 N.E.2d at 779).

"If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability." *Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001) (quoting *Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 564 (Ill. App. Ct. 1980)). In order to determine if a corporation was adequately capitalized, a court "must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Id.* (citing *Jacobson v. Buffalo Rock Shooters Supply Inc.*, 664 N.E.2d 328, 332 (Ill. App. Ct. 1996)).

In regards to ACT, Mr. Johnson testified in his deposition that ACT was initially funded with credit cards. (Docket No. 67-2 at 31.) According to the annual reports ACT filed with Illinois's Secretary of State, the amount of paid-in-capital for ACT was $1,000. (Docket Nos. 67-2 at 39; 67-3 at 19-29.) Additionally, Mr. Johnson testified that no one ever bought shares in ACT or paid capital into the company for shares. (Docket No. 67-2 at 19.) Aside from the small sum of paid-in-capital, according to Mr. Johnson's testimony, ACT's sources of funding to meet its operational expenses were credit cards, a line of credit, and its sales revenue. (Docket No. 67-2 at 39.)  In regards to credit cards, DuraCore contends that at the time of the transaction at issue, ACT held over $185,000 in credit card debt.[4] (Docket No. 67-1 at 20.)  The company was in so much debt that Mr. Johnson purchased his mother Sandra Johnson's 51 percent ownership in the company upon her retirement in 2012 for one dollar and stated that he believed that was the value of her stock or ownership interest in over half the corporation. (Docket No. 67-2 at 134-

---

[4] DuraCore bases this figure on the credit card statements provided in the record. (Docket Nos. 67-1 at 20; 67-3 at 42-53.) While the Court has verified that DuraCore's calculation is correct based upon the exhibits provided, the credit card statements in the record are from the years 2010 and 2011—the years prior to the transaction at issue. (See Docket No. 67-3 at 42-53.) Given the high balance on many of the credit cards held by ACT at the time, it is unlikely that these figures decreased significantly by the time of the transaction at issue but the Court does not have evidence to show the balance of these credit cards at the time of the transaction in question.

35.) Significantly, ACT's checking account statement from PNC Bank, for the time period during which DuraCore wired $107,400.00 to ACT's checking account, shows that prior to the payment by DuraCore, ACT's checking account balance was only $910.71. (Docket No. 67-5 at 1; *see also* Docket No. 67-4 at 3.) Furthermore, by the completion of the statement period, ACT had diminished the sum in its checking account to $31,502.45. (Docket No. 67-5 at 1.)

In his Response, Mr. Johnson does not address the factor of inadequate capitalization, (See Docket No. 70 at 7-9.), and while there is a significant amount of evidence in the record to suggest that ACT was inadequately capitalized, there is no evidence in the record to show that it was in fact adequately capitalized. Mr. Johnson has failed to rebut the evidence provided by DuraCore as to this factor. This factor weighs in favor of piercing the corporate veil.

2.   Commingling of Funds

DuraCore maintains that Mr. Johnson "commingled his personal assets and liabilities with those of ACT when he utilized the ACT bank account for personal expenses, to pay family members, and to pay for obligations of All Green, a company he wholly owned." (Docket No. 67-1 at 20.)

With regards to Mr. Johnson's use of ACT's funds for personal expenses, the record shows that he used ACT's funds to pay for a warehouse in which he stored his personal car collection. (Docket Nos. 67-2 at 146; 67-3 at 103-06.) Mr. Johnson signed checks on behalf of ACT to Rasche Cycle Co. for the storage of his "collector car hobby and product." (Docket No. 67-2 at 146.) Mr. Johnson testified that he did not pay ACT any money to store his cars in the warehouse. (Docket No. 67-2 at 147.) The size of the total warehouse space was approximately 7,000 square feet, and Mr. Johnson stated that his car collection occupied between 5,000 to 6,000

square feet of the space. (Docket No. 67-2 at 147.) He used the other 1,000 square feet of space to store items from his personal garage and three paint sprayers belonging to ACT. (Docket No. 67-2 at 148-49.) In March 2012, Mr. Johnson endorsed a check from ACT to himself for reimbursement of the rent he paid personally for the warehouse space in December 2013. (Docket Nos. 67-2 at 151-52; 67-3 at 107.) In total, Mr. Johnson used $10,700 of ACT's funds to pay Rasche Cycle Company to store his personal car collection, items from his garage, and three of ACT's paint sprayers in the warehouse in question. (Docket No. 67-3 at 103-11.)

In addition to the payments he made to rent the warehouse for his personal car collection and garage items, Mr. Johnson also authorized payments from ACT to his family members. Sandra Johnson, Mr. Johnson's mother, signed three checks from ACT to herself for a total amount of $6,500.00 between May 24, 2013 and June 18, 2013. (Docket Nos. 67-2 at 140-42; 67-3 at 100-03.) Mr. Johnson testified that these checks were for money that Sandra Johnson "wasn't paid" as she was no longer serving as the secretary and treasurer for ACT due to her retirement on December 31, 2012. (Docket No. 67-2 at 142; *see also* Docket No. 67-3 at 93.) Sandra Johnson was still a signatory on the account despite her formal retirement. (Docket No. 67-2 at 143.) According to Mr. Johnson, Sandra Johnson received the payments as compensation for "[f]or past, current, and present consulting fees for bookkeeping." (Docket No. 67-2 at 144.) When asked about the fair market value for bookkeeping services, Mr. Johnson responded that he felt he owed his mother the money. (Docket No. 67-2 at 145.) In her formal letter announcing her retirement, Sandra Johnson explicitly stated that she did not "expect any compensation from [ACT] after [December 31, 2012]." (Docket No. 67-3 at 93; *see also* Docket No. 67-2 at 145.)

Mr. Johnson also approved of checks written on behalf of ACT to his sister, Andrea Bright. (Docket Nos. 67-2 at 168; 67-3 at 98, 113.) On August 7, 2014, Andrea Bright signed a

check on behalf of ACT to herself in the amount of $1,000. (Docket No. 67-3 at 113.) According to Mr. Johnson, she was a consultant for ACT, and he gave her signatory rights for ACT's checking account in her capacity as a consultant. (Docket No. 67-2 at 167-68.) Mr. Johnson contends that the check from ACT to Andrea Bright was to compensate her for the consulting she did on behalf of ACT. (Docket No. 67-2 at 169.) When asked about the nature of her consulting work, Mr. Johnson responded that her work was "[p]robably [for the] website." (Docket No. 67-2 at 169.) Additionally, when asked if ACT's compensation to Andrea Bright for the work on its website was consistent with the fair market value for those services, Mr. Johnson replied that those services were worth $1,000 *to him*. (Docket No. 67-2 at 170.)

Lastly, Mr. Johnson used ACT's funds to pay for the legal fees to form All Green Chemical, his new limited liability company, and he moved all of ACT's remaining funds from its bank account with PNC to All Green's checking account at US bank. (Docket No. 67-1 at 6.) On April 7, 2014, Mr. Johnson used funds from ACT's account to pay LegalZoom.com for its assistance in forming All Green Chemical. (Docket Nos. 67-2 at 174-76; 67-3 at 116.) According to ACT's bank statement, Mr. Johnson paid LegalZoom.com $522.99 to form All Green Chemical using ACT's funds. (Docket No. 67-3 at 116.) Then, on August 29, 2014, Mr. Johnson withdrew $15,440.33 from ACT's bank account, the total sum of its funds, closed ACT's account, and transferred the funds to All Green Chemical's new account. (Docket Nos. 67-2 at 118; 67-3 at 89.) Mr. Johnson used ACT's remaining funds to provide All Green Chemical "its initial capital infusion." (Docket No. 67-2 at 119.)

Given Mr. Johnson's use of ACT's funds to satisfy personal expenses, pay family members, and cover the expenses of the newly formed All Green Chemical of which Mr. Johnson is the sole member and employee, there is significant evidence in the record that Mr.

Johnson commingled the funds of ACT, and this factor weighs in favor of piercing the corporate veil.

### 3.   Failure to Observe Corporate Formalities

With regards to the factor concerning a shareholder's failure to observe corporate formalities, Illinois courts have found that shareholders' "failure to hold regular meetings, take minutes, [and] maintain corporate records" satisfies this factor. *Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1024 (N.D. Ill. 2009) (citing *People v. V & M Indus., Inc.*, 700 N.E.2d 746, 751–52 (Ill. App. Ct. 1998)). Additionally, Illinois courts have found a failure to observe corporate formalities where "[n]o records were kept and the company did not hold formal shareholder or director meetings." *Id.* (quoting *Ted Harrison Oil Co., Inc. v. Dokka*, 617 N.E.2d 898, 902 (Ill. App. Ct. 1993)).

With regards to ACT, there is significant evidence that Mr. Johnson failed to observe corporate formalities. Mr. Johnson has testified that ACT did not have any official, written bylaws. (Docket No. 67-2 at 18.) Furthermore, while he does contend that shareholders and directors meetings for ACT were held each December in Grayslake, Illinois, Mr. Johnson does not provide the dates for those alleged meetings nor does he provide any minutes of those meetings. (Docket Nos. 67-2 at 18; 67-3 at 34-35.) In his deposition, Mr. Johnson unequivocally stated, "[w]e just did meetings together and we didn't really take record of it." (Docket No. 67-2 at 18.)  Mr. Johnson also testified that ACT did not file corporate tax returns in 2012 and 2013.

(Docket No. 67-2 at 28.) Lastly, Mr. Johnson acknowledges that "[n]o dividends or distributions were paid to any of the shareholders of ACT in the past 7 years." [5] (Docket No. 67-3 at 32.)

Given the lack of corporate formalities, this factor also weighs in favor of piercing the corporate veil.

### 4.   Absence of Corporate Records

In his Response to DuraCore's Motion for Summary Judgment, Mr. Johnson concedes that he "has not been able to produce corporate books and records." (Docket No. 70 at 8.) The record is void of any formal corporate records and as such this factor too weighs in favor of piercing the corporate veil.

### 5.   Diversion of Assets From the Corporation by or to a Stockholder or Other Person or Entity to the Detriment of Creditors

With regards to the diversion of assets to the detriment of creditors, there is significant evidence in the record that Mr. Johnson diverted ACT's assets for his personal benefit as well as for the benefit of his newly formed business and, consequently, this factor weighs in favor of piercing ACT's corporate veil. Once the State of Illinois dissolved ACT, Mr. Johnson transferred $15,440.33, all of the funds in ACT's bank account, to the bank account for his new business All Green Chemicals. (Docket Nos. 67-2 at 116-18; 67-3 at 89, 90.) While Mr. Johnson contends that in return for all of ACT's assets All Green Chemical assumed all of ACT's liabilities, there is no formal or informal documentation of such an arrangement. (Docket No. 67-2 at 120-21.) Furthermore, he sold ACT's "intellectual property, trademarks, copyrighted literature, testing

---

[5] ATC's failure to pay dividends to any shareholders not only demonstrates that ATC failed to observe corporate formalities, it also provides sufficient evidence to satisfy the factor regarding nonpayment of dividends. (Docket No. 67-3 at 32.)

documentation, customer, vendors, [and] suppliers" to All Green Chemical for a mere $1. (Docket No. 67-3 at 112.) Lastly, Mr. Johnson's used ACT's funds to satisfy his personal financial obligations, such as paying the rent on the warehouse for his car collection. (Docket No. 67-2 at 146.) Mr. Johnson's transfer of ACT's remaining funds to All Green, his sale of all of ACT's other assets to All Green for only $1, and his use of ACT's funds to satisfy his personal financial obligations provides sufficient evidence to demonstrate that he diverted the assets of ACT to the detriment of DuraCore and ACT's other creditors who have not yet received satisfaction of ACT's obligations to them.

6.   Failure to Maintain Arm's-length Relationships Among Related Entities

With regards to the factor concerning the failure to maintain arm's length relationships among related entities, it too weighs in favor of piercing the corporate veil. As of 2012, Mr. Johnson was the sole officer, shareholder, and director of ACT. (Docket No. 67-2 at 17.) Additionally, he is the sole member and employee of All Green Chemical. (Docket No. 67-2 at 115-16.) In his dual positions, Mr. Johnson transferred all of ACT's remaining funds and sold all of ACT's other assets to All Green Chemical for the meager price of $1. (Docket Nos. 67-2 at 116-18; 67-3 at 89, 90, 112.) In exchange for all of ACT's remaining funds and assets, Mr. Johnson contends that All Green Chemical is currently paying "the old bills of ACT" but there is no written, formal record of such an agreement. (Docket No. 67-2 at 73; 120-21.) Mr. Johnson also used ACT's funds to pay the legal fees he incurred from LegalZoom.com for the formation of All Green Chemical. (Docket Nos. 67-2 at 174-76; 67-3 at 116.) From All Green Chemical's very inception, Mr. Johnson failed to maintain an arm's length relationship between it and ACT.

7.      Whether the Corporation is a Mere Facade for the Operation of the Dominant Stockholders

The final element which concerns whether the corporation is a mere façade for the operation of the dominant stockholder weighs in favor of piercing ACT's corporate veil. In his deposition testimony, Mr. Johnson stated that he believed ACT and All Green Chemical and himself were "the same" because both entities were "owned by the same person." (Docket No. 67-2 at 163.) Mr. Johnson used ACT's funds to pay for the warehouse where he stored his personal car collection, to pay the legal fees for the formation of All Green Chemical Company, and to give money to family members. (Docket No. 67-2 at 140-50, 167-69, 171-75.)   All of the aforementioned actions demonstrate that ACT was a mere façade for the personal and business operations of Mr. Johnson.

B.  Promotion of Injustice or Inequality

Under the second prong of the test for piercing the corporate veil, "circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana*, 840 N.E.2d at 781 (first citing *People ex rel. Scott v. Pintozzi*, 277 N.E.2d 844, 851-52 (Ill. 1971); then citing *Estate of Wallen*, 633 N.E.2d at 1357).  "This prong requires something less than an affirmative showing of fraud, but something more than the mere prospect of an unsatisfied judgment." *Banco Panamericano*, 674 F.3d at 756 (quoting *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir. 1994)) (internal quotation marks omitted). According to the Seventh Circuit Court of Appeals, "Illinois law endorses veil piercing to avoid un[just] enrichment, permitting the creator of a liability and cause of the inability to meet that liability to escape responsibility, and . . . allowing a corporation to keep assets in a liability-free corporation while placing liabilities on

an asset-free corporation." *Id.* (quoting *Hystro Products*, 18 F.3d at 1390) (internal quotation marks omitted). The Seventh Circuit defines "unjust enrichment" "as the receipt of money or its equivalent under circumstances that, in equity and good conscience, suggest that it ought not to be retained because it belongs to someone else." *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir. 1993) (citing *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990)).

Here, to permit Mr. Johnson to enjoy the benefit of limited corporate liability in the face of his disregard for the corporate form would promote injustice as (1) Mr. Johnson would be unjustly enriched and (2) it would allow him "to keep assets in a liability-free [limited liability company] while placing liabilities on an asset-free corporation." *Banco Panamericano*, 674 F.3d at 756 (citation omitted).

First, Mr. Johnson "unjustly enriched himself by using corporate funds to pay personal expenses" as well as the expenses he incurred to form his new corporation All Green Chemical. *Sea-Land Servs., Inc. v. Pepper Source*, No. 88 C 4861, 1992 WL 168537, at *3 (N.D. Ill. July 10, 1992), *aff'd*, 993 F.2d 1309 (7th Cir. 1993); *see also* Docket No. 67-2 at 58-66, 140-50, 167-69, 171-75.) Mr. Johnson's use of ACT's funds to make payments for the storage of his car collection in a warehouse total $10,700. (Docket No. 67-3 at 103-11.) Significantly, while Mr. Johnson used over ten thousand dollars of ACT's funds for personal expenses, ACT has failed to satisfy its obligations to multiple creditors including but not limited to DuraCore. (Docket No. 67-2 at 58-66, 179-80.) To allow Mr. Johnson to be unjustly enriched from his use of ACT's funds while its creditors remain unpaid would certainly promote injustice.

Second, Mr. Johnson formed All Green Chemical on April 16, 2014 and subsequently moved all of ACT's remaining funds to All Green Chemical's bank account. (Docket No. 67-2 at 117, 172.) In addition to moving all of ACT's funds to All Green Chemical, in December 2013 prior to All Green Chemical's formation, Mr. Johnson sold all of ACT's other assets, including ACT's equipment, trademark, website, and customer base, to the not yet formed company for only $1. (Docket Nos. 67-3 at 112; 67-2 at 154-63.) Though Mr. Johnson claims that All Green Chemical has assumed all of ACT's liabilities in return for all of its assets, there is no formal record of such an agreement, and Mr. Johnson testified that he has been making all the payments that he "can" through All Green Chemical on behalf of ACT. (Docket No. 67-2 at 212.) Notably, he has made no payments to satisfy the default judgment entered against ACT by this Court on March 11, 2014, though he has acknowledged that it is a liability of ACT. (Docket No. 67-2 at 180.) There is substantial evidence that Mr. Johnson created "a corporate arrangement to keep assets in a liability-free [limited liability company] while placing liabilities on an asset-free corporation." *Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1042 (N.D. Ill. 2003). To allow Mr. Johnson to benefit from his orchestration of such a corporate arrangement would also certainly promote injustice. Consequently, DuraCore has satisfied the second prong of the test to pierce the corporate veil, and this Court will pierce the corporate veil of ACT.

## VI. Punitive Damages

In Kentucky, "punitive damages are reserved for only the most egregious acts and recoverable only if it is proven by clear and convincing evidence that an opposing party acted with oppression, *fraud*, or malice." *Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 911 (Ky. Ct. App. 2015) (emphasis added) (citing Ky. Rev. Stat. § 411.184).

As DuraCore has not proven its claim of fraud by clear and convincing evidence and this Court has found that there is a material issue of fact with regards to DuraCore's fraud claim, an award of punitive damages is not available at this time. This too appears to be an issue to be addressed at trial.

Conclusion and Order

For the aforementioned reasons, Plaintiff's Motion for Summary Judgment, (Docket No. 67), is **GRANTED** in part and **DENIED** in part.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

June 28, 2016

cc: Counsel